COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO. 2-05-346-CR

 

 

EVERETT
EUGENE RUSSELL                                                  APPELLANT

 

                                                   V.

 

THE STATE
OF TEXAS                                                                STATE

 

                                              ------------

 

         FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY

 

                                              ------------

 

MEMORANDUM OPINION[1]

 

                                              ------------

I.  Introduction








Appellant Everett Eugene Russell appeals his
conviction for violation of a protective order. 
A jury found Russell guilty and assessed his punishment at 365 days=
confinement and a $2,000 fine.  In five
points, Russell contends that the evidence is legally and factually
insufficient to establish that he violated a protective order and that the
trial court erred by failing to grant a mistrial after an inadmissible portion
of a 911 tape was played for the jury. 
We will affirm.

II.  Factual Background

During the course of Erin McRae=s
divorce from Russell, the 303rd District Court of Dallas County issued a
protective order against Russell.  A
certified copy of the protective order was admitted into evidence.  It prohibited Russell Afrom
going to or near the residences or places of employment or business of [McRae]@ and
specifically prohibited Russell Afrom
going to or near the residence at 2120 Pueblo Drive, Carrollton, Dallas County,
Texas.@  When the protective order was issued, McRae
lived at 2120 Pueblo Drive in Carrollton, 
but at the time of the incident, she had moved into her stepfather=s house
at 105 East Brown Terrace.  This house
was located at the end of a dead-end road in Shady Shores, Texas. 








On February 26, 2005 at about 10 o=clock
a.m., McRae and a friend who had spent the night at the house with her, Heather
Trout, were feeding horses on the property when McRae saw a white truck parked
on the road.   McRae then saw Russell
walking down the fence line on her stepfather=s
property.  McRae and Heather ran back to
the house.  They obtained binoculars and
verified that the man they saw on the property was Russell; then they got down
on the floor in the house, and McRae called 911.[2]  Heather called McRae=s
mother.  

McRae testified that she was certain the man she
saw on her stepfather=s property was her ex-husband,
Russell, because she recognized his walk and the clothes he was wearing.  She explained that Russell had Akind of
a limp@ because
he had undergone back surgery, that he would cock his head when he turned to
look at something, and that she had washed the items of clothing he was wearingCblack
nylon pants, a maroon and darker blue jacket, and a white T-shirtCseveral
times when they were married.  McRae
testified that she had no doubt that the person she saw through the binoculars
was Russell.








McRae testified that Russell had been to her
stepfather=s property on one occasion about
two and a half or three years earlier. 
She did not tell Russell that she had moved to this property and took
precautions to prevent him from discovering that she was living there.  She testified that Russell must have
remembered visiting the property and must have surmised that she might be
living there because he knew that she owned three large dogs and would be residing
at a location that could accommodate her dogs. 
McRae testified that her vehicle and Heather=s
vehicle were parked in the driveway and would have been recognized by
Russell.  She explained that Russell had
no reason to be Aout there.@ 

Heather testified that Saturday morning, as she
and McRae were feeding horses, McRae saw a parked white truck and claimed to
see a man running.  McRae told Heather to
get to the house; when Heather looked through the binoculars, she recognized
the man McRae had seen as Russell.  She
had no doubt that the man she viewed through the binoculars was Russell.  

Sergeant David Allen with the Corinth Police
Department responded to a dispatch on February 26, 2005 on Brown Terrace Road
for a violation of a protective order. 
He stated that a fellow officer searched the area but was unable to
locate Russell or anyone else that might match the description given by McRae.  Sergeant Allen and the other officer escorted
Heather and McRae out of the area. 
Sergeant Allen testified that he arrived at 10:47 a.m. and left at 11:07
a.m. 








Russell=s
mother, Charlene, testified in his defense. 
She explained that she left her house at 9:45 a.m. on the date in
question to attend a funeral.  She said
that when she left Russell was awake. 
Charlene testified that Russell planned to get on the internet to obtain
some prices for products from Lowe=s and
Home Depot for remodeling her bathroom. 
She testified that Russell was at home when she returned from the
funeral at 4 p.m. and that his car was in the same spot as when she had left.  Charlene testified that she thought Russell
was at home the previous night, but she did not get off work until 11:30 or
11:45 p.m. 

Russell=s older
brother, Travis Todd Russell, also testified on Russell=s
behalf.  He explained that he had called
his mother=s house between 10 and 11 a.m.
on February 26, 2005 and had asked Russell to check on the status of his income
tax refund. 

Russell took the stand and testified that he was
at his mother=s house on Saturday morning,
February 26, 2005 at 10 o=clock a.m.  Russell said that his brother Travis called
at 10:15 and that they talked for about twenty-four minutes.  Russell said he checked on his brother=s income
tax refund on the IRS website that morning and also checked prices on Home
Depot=s
website and Lowe=s website.  Russell had made a disk showing the websites
that he had visited on February 26, 2005, and the Acookies@ on the
disk showed that he was on the IRS website at 10:29 a.m. Central Standard
Time.  The disk also shows that Russell
was online from 10:29-11:00 a.m. and again at 1:04 p.m.  Russell testified that he did not leave his
mother=s house
at all that morning and that he was there when his mother returned from the
funeral. 








With regard to the house in Shady Shores, Russell
testified that he had been there once a few years ago.  Russell said that the house was 27.4 miles
from his mother=s house and that it would have
taken him forty-five minutes to drive there. 
Russell denied knowing where McRae lived; he said that he knew only that
the house on Pueblo Drive had been foreclosed on, so he knew she was not living
at that location.  Russell also denied
owning or driving a white Suburban and said that he could not run or walk fast
because of his back.

James Willingham, a felony investigator for the
criminal district attorney=s office
working in computer forensics, testified as a rebuttal witness.  He explained that a Acookie,@ like
the ones that Russell had copied to the disk, gets its date and time from the
computer and that the computer=s date
and time are set by the user.  Thus, he
concluded that the dates and times on the disk purporting to show when Russell
allegedly visited the websites are Avalueless,
absent any other context, to say when they were actually done.@  








Brittany Dieterich, McRae=s half
sister, also testified in rebuttal. 
Brittany testified that at about 1:30 a.m. on February 26, 2005, she
heard a loud car coming down her street in Carrollton.  She also heard someone Ahooting
and hollering.@ 
She explained that she thought the noise was strange because her street
is typically very quiet.  Brittany said
that she looked out the window and saw a white sport utility vehicle making a
U-turn.  She recognized the driver; she
said she is certain it was Russell.  She
explained that Russell knew that McRae=s mother
lived there.  The family called the
police and also called McRae.  

Dieterich also testified that on February 27,
2005, the day after the incident in question, she and McRae went to the house
in Shady Shores to feed the horses and to look around.  She said that they found ten to twelve fairly
new Keystone beer cans in a ditch on the side of the road.  She noted that Keystone beer was Russell=s
favorite kind of beer and said that he drank it frequently.  

After hearing the above testimony, the jury found
Russell guilty of violation of a protective order and assessed his punishment
at 365 days= confinement and a $2,000
fine.  This appeal followed.

III.  Violation of Protective Order

A.  The Allegations Set Forth in the Information

 

The
information alleged that Russell,

 

on or about [the] 26th
day of February, A.D. 2005, and before the making and filing of this Complaint,
in the County of Denton, of the State of Texas, did then and there in violation
of an order issued under sections 6.504 or Chapter 85, Family Code, under
Article 17.292, Code of Criminal Procedure, or by another jurisdiction as
provided by Chapter 88, Family Code, intentionally or knowingly go to or within
250 feet of the residence of ERIN MCREA [sic] a protected individual under a
Protective Order issued in cause number DF04-10408-V-303 in the 303rd Judicial
District Court of Dallas County, Texas; 

 








against the peace and
dignity of the State.

 

B.     Russell=s
Sufficiency Arguments

In his first point, Russell contends that there
was insufficient evidence to establish that he violated a protective order as
alleged in the information. Specifically, Appellant argues that the record is
devoid of any evidence establishing that a protective order was issued under sections
6.504 or chapter 85 of the family code, under article 17.292 of the code of
criminal procedure, or by another jurisdiction as provided by chapter 88 of the
family code.  In his second and third
points, Russell contends that there was legally and factually insufficient
evidence to establish that he went within 250 feet of McRae=s
residence.  In his fourth point, Russell
argues that the evidence was legally insufficient to establish that he
intentionally or knowingly went within 250 feet of McRae=s
residence because there was no proof that Russell had knowledge of McRae=s
residence.[3]  Because all of these points are interrelated
and involve the same set of facts, we address them together below.

C.     Legal and Factual Sufficiency Standards of
Review








In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the verdict in order to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v. State, 165 S.W.3d
691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).








In reviewing the factual sufficiency of the
evidence to support a conviction, we are to view all the evidence in a neutral
light, favoring neither party.  See
Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual
sufficiency review is whether, considering the evidence in a neutral light, the
fact-finder was rationally justified in finding guilt beyond a reasonable
doubt.  Id. at 484.  There are two ways evidence may be factually
insufficient:  (1) when the evidence
supporting the verdict or judgment, considered by itself, is too weak to
support the finding of guilt beyond a reasonable doubt; or (2) when there is
evidence both supporting and contradicting the verdict or judgment and, weighing
all of the evidence, the contrary evidence is so strong that guilt cannot be
proven beyond a reasonable doubt.  Id.
at 484-85.  AThis
standard acknowledges that evidence of guilt can >preponderate= in
favor of conviction but still be insufficient to prove the elements of the
crime beyond a reasonable doubt.@  Id. at 485.  In other words, evidence supporting a guilty
finding can outweigh the contrary proof but still be insufficient to prove the
elements of an offense beyond a reasonable doubt.  Id. 

In performing a factual sufficiency review, we
are to give deference to the fact-finder=s
determinations, including determinations involving the credibility and demeanor
of witnesses.  Id. at 481; Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the
fact-finder=s.  Zuniga, 144 S.W.3d at 482.








A proper factual sufficiency review requires an
examination of all the evidence.  Id.
at 484, 486-87.  An opinion addressing
factual sufficiency must include a discussion of the most important and
relevant evidence that supports the appellant=s
complaint on appeal.  Sims v. State,
99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

D.     Sufficiency Analysis

1.     Protective Order Issued Under Family Code

With regard to whether the evidence established
that the protective order was issued under any valid statute or pursuant to any
divorce proceeding, McRae testified that the protective order was issued
against Russell during their heated divorce. 
Later during McRae=s testimony, the State admitted
into evidence a certified copy of the protective order. 








Russell appears to contend that because the
certified copy of the protective order was not admitted immediately following
McRae=s
testimony about obtaining the protective order and about her heated divorce
from Russell, no evidence exists that the protective order was issued pursuant
to any statutory provision as alleged in the information.  As set forth above, the information alleged
that a protective order was issued under section 6.504 of the family code; that
section states, AOn the motion of a party to a
suit for dissolution of a marriage, the court may render a protective order.@  Tex.
Fam. Code Ann. ' 6.504 (Vernon 2006).  Russell points us to no case law or statute,
and we know of none, requiring that the jury receive the certified copy of the
protective order at the same time that it heard testimony from McRae regarding
the protective order that was issued during her divorce from Russell.

Consequently, reviewing the record as a whole, we
hold that there was sufficient evidence that the protective order in the
present case was issued pursuant to section 6.504 of the family code, as
alleged in the information.  Cf.
Gardner v. State, No. 05-05-00750-CR, 2006 WL 1413098, at *2 (Tex. App.CDallas
May 24, 2006, no pet.) (mem. op.) (not designated for publication) (holding
that record reflects that protective order was issued under chapter 85 of the
family code).  We overrule Russell=s first
point.

2.     Sufficient Evidence of Distance








The State introduced a large aerial map of the
property into evidence.  The aerial map
contains a scale on the right hand side, demonstrating a 250-foot distance as
portrayed on the map.  In front of the
jury, McRae demonstrated on the aerial map the location where she was standing
and the route that Russell had taken around and across the property.  From McRae=s
testimony, from the locations pointed out by McRae on the aerial map, and by
reviewing the aerial map introduced into evidence, the jury was able to
determine that Russell was within 200 feet of the house where McRae was
living.  Applying the proper standard of
review, we hold that legally sufficient evidence exists to establish that
Russell went within 250 feet of McRae=s
residence on the date in question.  We overrule
Russell=s second
point.

Because there was no contrary evidence that
Russell was in the area but outside the protected 250-foot zone, the issue for
the jury was whether to believe McRae=s
testimony that she saw Russell or whether to believe Russell=s
testimony that he was at home on the day in question.  Because we are to give deference to the
fact-finder=s determinations involving
credibility of witnesses, we cannot say that the evidence was factually
insufficient to prove that Russell came within the protected 250-foot
zone.  See Spencer-Auber v. State,
No. 05-03-01259-CR, 2004 WL 330096, at *2 (Tex. App.CDallas
Feb. 23, 2004, pet. dism=d) (not designated for
publication) (holding that evidence was legally and factually sufficient to
support conviction for violation of protective order even though State=s
witnesses gave conflicting testimony and defense witnesses consistently stated
that appellant never left his house on the evening in question).  We overrule Russell=s third
point.

3.     Sufficient Evidence Showing Knowledge of
Residence








Russell claims that legally insufficient evidence
exists to establish that he knew McRae resided at 105 East Brown Terrace and
therefore that he  intentionally or
knowingly went within 250 feet of that residence.  Although the protective order lists McRae=s
residence as 2120 Pueblo Drive in Carrollton, 
Russell admitted that he knew McRae was no longer living there because
that house had been foreclosed on in late January.  McRae testified that Russell would have known
that she had to move to a place where her three dogs could live and that he had
visited her stepfather=s property in Shady Shores once
while they were married.  In the early
morning hours on the day in question, McRae=s half
sister saw Russell in Carrollton, Ahooting
and hollering@ while driving a white sport
utility vehicle.  Later on the day in
question, Heather said that she saw a white sport utility vehicle after she
spotted Russell on the property.  At that
time, both McRae=s vehicle and Heather=s
vehicle were parked in the driveway and would have been recognized by
Russell.  McRae=s half
sister also testified that the next day, she and McRae found ten to twelve
fairly new Keystone beer cans in a ditch on the side of the road near the property
and that Russell=s favorite kind of beer was
Keystone.  McRae testified that her
stepfather=s house in Shady Shores is at
the end of a dead-end road and that Russell had no reason to be in the area. 








Having considered all of the evidence in the
light most favorable to the judgment, we conclude that a rational trier of fact
could have found that Russell had determined that McRae was living at the Shady
Shores property and that he intentionally or knowingly went there in violation
of the protective order.  See Jackson,
443 U.S. at 319, 99 S. Ct. at 2789; Lee v. State, 983 S.W.2d 77, 78
(Tex. App.CSan Antonio 1998, no pet.) (holding
that legally sufficient evidence existed showing that appellant knew of the
protective order and knowingly violated it when he went to complainant=s mother=s
apartmentCin the same apartment complex
where complainant livedCbecause protective order listed
address of apartment complex as complainant=s
address); see also Cowley v. State, No. 11-99-00220-CR, 2000 WL
34235120, at *3 (Tex. App.CEastland
Aug. 31, 2000, no pet.) (not designated for publication) (holding that legally
sufficient evidence existed showing that appellant intentionally and knowingly
violated protective order by going within 500 feet of complainant=s
house).  We overrule Russell=s fourth
point.

IV.  Failure to Preserve Error Regarding Inadmissible
Portions of the 911 Tape That Were Played for the Jury

 

In his fifth point, Russell argues that the trial
court committed reversible error by failing to grant a mistrial because an
inadmissible portion of the 911 tape was played for the jury.[4]  The State responds that Russell did not
preserve his claim because he failed to request an instruction to disregard. 








During the trial, the State introduced a
recording of the 911 call made by McRae. 
Russell objected to two portions of the recording in which McRae told
the operator that Russell Ahad just
gotten out of jail@ and that Ahe=s crazy.@  The trial court sustained Russell=s
objections to those two portions of the recording.  The State agreed to reduce the volume a
couple of seconds before each statement played on the recording, and the trial
court admitted the recording with the understanding that the jury would not
hear the two objected-to statements.  

However, Russell claims that when the recording
of the 911 call was played for the jury, the State tried to mute the volume,
but the microphone was still slanted downward and the two objected-to
statements were audible and the jury heard them.[5]  Russell asked for a mistrial, specifically
stating that he was not requesting the trial court to give the jury any
instruction to disregard because it would call more attention to the inadmissible
statements.  The trial court denied
Russell=s motion
for mistrial but told the State that it would Anot be
able to argue that issue and [would] not be able to cross-examine or bring that
issue up. . . . @ 








Generally, a defendant who requests a mistrial
without first requesting a curative instruction forfeits appellate review of
that class of events that could have been cured.  Young v. State, 137 S.W.3d 65, 69
(Tex. Crim. App. 2004). An exception to this general rule may occur when any
instruction to disregard could not have cured the harm caused.  Id.; see also Barnett v. State,
189 S.W.3d 272, 278 (Tex. Crim. App. 2006). 
In a case directly on point, we have held that isolated, unmuted
videotape comments concerning a defendant=s
criminal history constitute the type of error that may be cured by an
instruction to disregard.  Hayes v.
State, No. 02-03-00515-CR, 2005 WL 1994178, at *1-2 (Tex. App.CFort
Worth Aug. 18, 2005, pet. ref=d) (mem.
op.) (not designated for publication). 
In Hayes, we held that the trial court did not abuse its
discretion by denying appellant=s motion
for mistrial when the State failed to depress the mute button during
inadmissible portions of a videotape referencing appellant=s prior
arrest.  Id.  In that case, the appellant moved for and
received an instruction to disregard.  Id.
at *1.  We concluded that the fact of
appellant=s prior arrest Awas not
embellished, relied on, argued, or treated in any manner so inflammatorily as
to undermine the efficacy of the trial court=s
instruction to disregard.@ 
Id. at *2.








In the case at hand, Russell decided not to
request an instruction to disregard. 
While such a decision may certainly be sound trial strategy, the lack of
a request for an instruction to disregard forfeits appellate review of any
alleged error resulting from isolated comments concerning a defendant=s
criminal history, and here, his mental state. 
See Young 137 S.W.3d at 70; Hayes, 2005 WL 1994178, at
*1-2; see also Ovalle v. State, 13 S.W.3d 774, 783 (Tex. Crim. App.
2000) (stating that A[o]rdinarily, a prompt
instruction to disregard will cure error associated with an improper question
and answer, even one regarding extraneous offenses@).  As we held in Hayes, this type of
error falls into the class of events that could have been cured by an
instruction to disregard.  Hayes,
2005 WL 1994178, at *1-2.  Consequently,
Russell has forfeited appellate review of any error that occurred when the
volume on the 911 tape was not completely muted during the two objected-to
statements.  We therefore overrule
Russell=s fifth
point.

V.  Conclusion

Having overruled all five of Russell=s
points, we affirm the trial court=s
judgment.

 

SUE
WALKER

JUSTICE

 

PANEL F:  LIVINGSTON, DAUPHINOT, and WALKER, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED: October 12,
2006











[1]See Tex. R. App. P. 47.4.





[2]The State played portions
of the tape from McRae=s phone call to 911 for
the jury. 





[3]Russell does not argue
that he did not have knowledge of the protective order.





[4]Russell does not argue
that the State intentionally failed to mute the recording.





[5]For purposes of our
analysis, we will assume that the statements were audible to the jury.  The record, however, is not clear on this
point.  Russell=s counsel claimed that
she could hear the statements despite the lack of volume, but the record does not
affirmatively reflect that any juror heard the statements.